**WOODWARD** v. **UNITED STATES.**
**No. 14707.**

United States Court of Appeals
Eighth Circuit.

Dec. 8, 1953.

Tyrell M. Ingersoll, Cedar Rapids, Iowa (Robt. W. Clewell, Robert O. Daniel, Dubuque, Iowa, Elliott, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, and Clewell, Cooney & Fuerste, Dubuque, Iowa, on the brief), for appellant.

Joseph F. Goetten, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Alonzo W. Watson, Jr., Sp. Assts. to Atty. Gen., and Francis E. Van Alstine, U. S. Atty., Sioux City, Iowa, on the brief), for appellee.

Before SANBORN and THOMAS, Circuit Judges, and HARPER, District Judge.

SANBORN, Circuit Judge.

The Commissioner of Internal Revenue assessed deficiencies in the federal income taxes of F. W. Woodward, of Dubuque, Iowa, for the years 1944, 1945, and 1946, based upon the disallowance of certain claimed deductions. The taxpayer paid the additional taxes assessed, made timely claims for refund, and, upon their denial, brought this action under § 1346(a) (1), Title 28 U.S.C.A., asserting that the deficiencies had been illegally assessed.

The deductions disallowed by the Commissioner, with which this Court is concerned, involved amounts paid by the taxpayer to his wife as interest upon promissory notes payable on demand to her, with interest at 4%, which the taxpayer claimed he executed and delivered to her as the consideration for the repurchase or reacquisition by him of five policies of insurance upon his life which he had given to her in 1937 and which, in December 1939, he reacquired and placed in trust for her benefit.

The Commissioner determined that the payments made by the taxpayer to his wife in the years in suit as interest upon the promissory notes were not deductible as "interest paid or accrued within the taxable year on indebtedness," within the meaning of § 23(b) of the Internal Revenue Code, 26 U.S.C.A. § 23(b); that there was no real substance to the transaction out of which the notes arose; and that they were not enforceable and were merely gifts, interest upon which was not deductible from gross income.

The issue which was tried by the District Court, without a jury, was whether the notes evidenced genuine bona fide "indebtedness". The District Court

found as a fact that "The transaction giving rise to the execution of the notes * * * lacked economic reality and the interest payments thereon in 1944, 1945, and 1946 were not paid upon an 'indebtedness' within the scope of the provisions of § 23(b) of the Internal Revenue Code," and were not deductible. From so much of the judgment as reflected that determination, this appeal was taken.

The District Court wrote an exhaustive opinion, in which the facts relative to the notes in suit and the transactions out of which they arose are stated in complete detail. 106 F.Supp. 14.

The taxpayer in 1937 gave to his wife, Elsie M. Woodward, for her benefit and protection, five policies of insurance on his life aggregating in face value $125,000. He retained no interest in the policies, although he continued to pay the premiums. He filed a federal gift tax return for the year 1937, listing the transfer of the policies as a gift to his wife in the amount of $13,474.50, apparently their then value.

On December 26, 1939, the taxpayer entered into a trust agreement with his wife and their son, F. Robert Woodward, in which the five policies were scheduled as a part of the trust property, together with certain shares of stock. By the terms of the trust, Elsie M. Woodward was to receive from the trustees, consisting of the taxpayer, his wife, and their son, a fixed annuity of $300 a month during the taxpayer's lifetime, and $1,000 a month after his death. The trustees, other than the taxpayer himself, were authorized to pay his wife "such additional sums as they shall consider necessary or advisable for her comfort, pleasure, or support, or to meet any emergencies affecting her * * *." After the death of the taxpayer's wife, the trust was to continue for the benefit of their son, F. Robert Woodward.

The taxpayer's wife on December 28, 1939, executed an assignment to the tax-payer of two of the five policies in suit. The insurer was, on the same date, requested to make the estate of the taxpayer the beneficiary of the two policies. On January 30, 1940, the taxpayer's wife executed assignments to the taxpayer of the three other policies. On January 31, 1940, the taxpayer sent in requests that the beneficiary of each of these three policies be changed to "The Insured's executors or administrators." On January 23, 1940, the taxpayer assigned to the trustees of his trust two of the policies, and on February 19, 1940, he assigned the other three policies to them. While the assignments of the policies were completed after the date of the trust agreement, the delay in perfecting the assignments of the policies to the trustees was due to the necessity of complying with the formal requirements of the insurers with respect to the making of such transfers and the necessary changes in beneficiaries.

The demand notes payable to Elsie M. Woodward were executed by the taxpayer on the following dates and in the following amounts:

| | |
|---|---|
| December 28, 1939, | $ 5,098.00 |
| January 31, 1940, | $16,748.52[1] |
| February 16, 1940, | $ 2,159.69 |

The aggregate principal amount of the notes was the cash value of the five life insurance policies in suit.

According to the endorsements on the notes, interest on the $5,098.00 note and the $2,159.69 note was paid December 30, 1940, for the year 1940, and was not again paid until December 26, 1944, when interest for the years 1941, 1942, 1943, and 1944 was paid. Interest on the $16,748.52 note to December 31, 1944, was not endorsed upon it until December 26, 1944. It appears, however, that interest of $310.81 was paid on December 30, 1940. No principal payments were made upon any of the notes.

Tharsella Pins was the only witness, aside from the taxpayer himself, who testified in support of his claim.

---

[1] This note was in 1944 split up into new notes aggregating the same principal amount as the original note.

The taxpayer's testimony, so far as material, may be summarized as follows:

He was and had been for many years in the business of publishing the Dubuque Telegraph Herald and owned a majority of the stock of the Dubuque Telegraph Herald corporation. He executed and delivered the notes in suit to his wife. When he executed the notes he received the insurance policies which he had previously given to her. The amount of the notes was the value of the policies when she assigned them to him. He had given the policies to his wife for her protection so that she would be taken care of in case he met with financial reverses. The newspaper was not heavily in debt in 1937, "but we were planning to go into debt." The taxpayer's wife owned none of the stock of the newspaper corporation. In the latter part of 1939 the taxpayer conceived the idea of setting up a trust for his family. A number of his friends had done the same thing. He intended to put the insurance policies in the trust for his wife's protection, together with 200 shares of the stock of the Dubuque Telegraph Herald corporation. He probably talked to her about it. He believed that the trust would give his wife greater protection and benefit than the assignments to her of the policies made in 1937. He asked her for the policies and told her he would buy them back, "that I would have to buy them back," but never said he would give her the notes in order to get the policies. He testified: "I had given them [the policies] to her, and it was one way of getting them back to put them in there [the trust], and I figured that it was more protection for my wife and family." He stated that he had no reason for giving her the notes in exchange for the policies except the additional protection for her and his family. He never made any payments on the principal of the notes and gave no collateral to secure them.

Tharsella Pins, a private secretary employed by the Dubuque Telegraph Herald, testified that she had been in its employ since 1942; that, in addition to her work there, she took care of personal records for the taxpayer and his wife, without compensation from them; that she worked under the supervision of the taxpayer and his son; that they and she took care of Mrs. Woodward's banking transactions; that Mrs. Woodward could sign the taxpayer's checks and he could sign her checks; that she (Miss Pins) began keeping records for the taxpayer and his wife about January 1, 1943; that the reason interest payments on the notes in suit were not made each year was that the taxpayer's son, F. R. Woodward, who had had charge of the records, was in the military service and was not able to tell her about making the payments; that it was upon his return on leave that he discovered that interest payments on the notes had not been kept up; that they were supposed to be made each year; that the notes were kept in a locked file in the safe in her office, which adjoins that of the taxpayer; that she, the taxpayer and his son knew the combination of the safe; that she did not know whether Mrs. Woodward knew it: that she (Miss Pins) handled all of Mrs. Woodward's deposits; that Mrs. Woodward's income during the years 1944, 1945, and 1946 consisted of income from the trust in suit and from another trust created by the taxpayer, and dividends or payments from the sale of stock and payments on a mortgage.

The factual basis for the District Court's findings and conclusion is stated as follows on page 29 of 106 F.Supp:

"When all relevant factors are considered it does not appear that the transaction by which the plaintiff reacquired the insurance policies from his wife was a transaction which had economic reality. It appears that prior to the time when Elsie M. Woodward assigned the policies back to the plaintiff that the plaintiff had determined to put them in a trust of which his wife would be a lifetime income beneficiary. It appears that he discussed these plans with her prior to the assignment of the policies back to him.

He testified that he did not ask her whether she would give the policies back to him. It does not appear that there was any bargaining between them with respect to the matter. The plaintiff did testify on cross examination that he gave her the notes because it was one way of getting the policies back, but he also testified that he had no other reason for giving her the notes than to provide further protection for her. The notes, though originally delivered to Elsie M. Woodward, were subsequently kept in the plaintiff's office safe. The plaintiff's office secretary testified that she, the plaintiff, and the plaintiff's son knew the combination of such safe, but that she did not know whether the plaintiff's wife knew it. The plaintiff apparently handled most of his wife's financial and business activities, with his secretary carrying out most of the details. It is noted that the plaintiff's wife did not testify as to the validity of the sale of the policies back to the plaintiff and that no explanation was made for her not testifying. Cf., Poplet v. Surface Transp. Corp., City Ct.N.Y.1952, 109 N.Y.S.2d 871, 876–880. She alone could have testified as to whether the transfer of the policies by her to the plaintiff was induced by and was in exchange for his issuing the notes to her. * * *"

It is obvious that in creating the trust of December 26, 1939, which provided the taxpayer's wife during his lifetime with a minimum income of $3,600 a year, and, after his death, with an income of at least $12,000 a year, the taxpayer put her in a far better position economically than she was in when she owned the policies in suit outright; and that the District Court was justified in inferring, as it did, "that the execution of the notes was an additional act of benevolence on his [the taxpayer's] part rather than a condition exacted by her [his wife] for the reassignment of the policies", and that therefore the transaction out of which the notes arose was a matter of form rather than of economic substance.

The Commissioner's ruling that interest on the notes in suit was not deductible had the support of a presumption of correctness, and the taxpayer had the burden of proving it to be wrong. Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184; Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212.

To what extent, if at all, the taxpayer's testimony with respect to the giving of the notes may have been affected by self-interest was for the trial court to determine. Compare, Rasmussen v. Gresly, 8 Cir., 77 F.2d 252, 253–254. Having prevailed in the District Court, the Government, on review, is entitled to the benefit of every inference which reasonably can be drawn from the evidence, viewed in the light most favorable to the Government and most unfavorable to the taxpayer.

Where opposing inferences reasonably may be drawn from evidence, it is for the trier of the facts to determine what inference shall be drawn. Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 40, 57 S.Ct. 324, 81 L.Ed. 491; Bogardus v. Commissioner, 302 U.S. 34, 45, 58 S.Ct. 61, 82 L.Ed. 32; Helvering v. Johnson, 8 Cir., 104 F.2d 140, 144, affirmed 308 U.S. 523, 60 S.Ct. 293, 84 L.Ed. 443; Tyson v. Commissioner, 8 Cir., 146 F.2d 50, 54.

This is one of those cases which not infrequently arise in which a taxpayer claims that transactions with his wife, which if genuine and effective would reduce his tax liability, are exactly what they purport to be and must be accepted at their face value; the Government contending, on the other hand, that the transactions are lacking in substance and are, in effect, "mere formalisms, which exist solely to alter tax liabilities". Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981. Arrangements between husband and wife affecting tax liability may be genuine

and effective or may be in the nature of camouflage and ineffective so far as tax consequences are concerned. Questions of good faith, motive, intent, and the like, if at all doubtful, are ordinarily questions to be determined by the trier of the facts. Compare, Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 743, 69 S.Ct. 1210, 93 L.Ed. 1659; National Labor Relations Board v. Brown & Root, Inc., 8 Cir., 203 F.2d 139, 147.

■ If the giving of the notes in suit and the payment of interest on them had no significance economically and were acts of benevolence on the part of the taxpayer, so much of his taxable income as was attempted to be siphoned off thereby in each of the years in suit still remained taxable to him. When a taxpayer parts with income under the guise of interest payments in fulfillment of a mere moral obligation, the income is still his and may not be attributed to a "different tree from that on which it grew." Helvering v. Horst, 311 U.S. 112, 120, 61 S.Ct. 144, 149, 85 L.Ed. 75; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731.

■ Under Iowa law, as the District Court pointed out, notes executed gratuitously are mere promises to give money in the future, and are unenforceable. Meginnes v. McChesney, 179 Iowa 563, 570–578, 160 N.W. 50, 53–55, L.R.A. 1917E, 1060; Latcham v. Latcham, 195 Iowa 221, 191 N.W. 977; Gilman v. Commissioner, 8 Cir., 53 F.2d 47, 50, 80 A.L.R. 209. In DePenning v. Bedell, 242 Iowa 102, 110, 44 N.W.2d 385, 390, decided by the Supreme Court of Iowa in 1950, that court said:

"We think the consideration which led these parents to execute these notes and this mortgage was an understandable and laudable desire to shield from loss their children who had not received in cash the full amount of advancement the others had received. But this does not constitute a legal consideration. Under this Record we must conclude the instruments in suit represent unexecuted gifts. They were without consideration and unenforceable."

■ Our conclusion is that it cannot be said as a matter of law that the taxpayer was entitled to deduct the payments of interest on the notes in suit from his gross income under § 23(b) of the Internal Revenue Code.

The judgment appealed from is affirmed.